## WARREN v. RAYMOND.

1. What points were decided, what claims adjudicated, and the status of what parties determined, on the former appeal in this cause (12 *S. C.* 9), stated.

2. The lands of an ancestor in the hands of his heir are liable for his debts unless *bona fide* aliened before action brought; but a mortgage by the heir does not operate as such an alienation until the mortgagor is out of possession.

3. All points decided by this court on appeal, or necessarily involved in what was decided, are *res judicata*, and cannot be again considered in the cause.*

---

* See *Hart* v. *Bates*, ante p. 35. The distinction should be borne in mind between the effect of a decision of this court upon the cause itself, and upon the same point involved in another and subsequent suit. In the former it is *res judicata*, an estoppel by judgment, or matter of record, and, whether right or wrong, cannot be disturbed by this court on a second appeal. But in the latter case the principle may be reconsidered and, if erroneous, reversed. R.

4. A mortgage of land since the act of 1791 (5 Stat. 169) is not an aliena-tion but a security by lien for the payment of the debt; and it cannot be held an alienation because that a mortgage was in effect a convey-ance in 1712, when the act of 3 & 4 W. & M. ch. 14, was made of force in this state.

5. A proceeding against an heir-at-law, not, however, *qua* heir, but in the character of an executor *de son tort*, cannot be regarded as an action against the heir for the debt of the ancestor.

6. A judgment against an executor *de son tort* cannot be levied on the lands of the intestate.

7. A judgment obtained prior to the act of 1873 (15 Stat. 498), amending the code, has no lien until the requirements of that act are complied with; and a transcript of such a judgment without lien lodged in an-other county after that act is also without lien.

8. A judgment obtained against an executor *de son tort* in a misconceived action against him to have the lands of the intestate applied to the sat-isfaction of an unenrolled decree rendered during the intestate's life-time, did not so merge the intestate's debt as to destroy the bond upon which the whole proceeding was founded.

9. The force of a decision of the Supreme Court upon a point fully argued with all the testimony before it is not affected by the statement of the justice who wrote the opinion that "no exception had been taken to this finding of fact," when in truth an exception had been taken by one of many parties to the cause.

10. A mortgagee, with knowledge in part of the ancestor's indebtedness, took from the heir-at-law, to secure the repayment of a present loan, a mortgage of lands descended, with a covenant authorizing the mort-gagee on default in his mortgage or in a prior mortgage on the same property, to take possession; learning afterwards that action was about to be instituted to subject the mortgaged lands to the payment of the ancestor's debt, the mortgagee took possession under the covenant of his mortgage. *Held*, a *bona-fide* alienation under the statute 3 & 4 W. & M, ch. 14, § 5.

11. And the mortgagor, being out of possession as to this mortgage, was also out of possession as to the prior mortgage on the same lands.

12. The question of *bona-fides* under the statute 3 & 4 W. & M. ch. 14, § 5, is not identical with the question of *bona fides* in a purchase for valu-able consideration without notice.

13. This case distinguished from *Lowry* v. *Pinson,* 2 *Bail.* 324.

14. Concurrent findings of fact by referee and circuit judge sustained.

15. The obsolete law of double mortgages depriving the mortgagor of his equity of redemption, although incorporated into the General Statutes of 1872 (ch. lxxxii. § 8), is inconsistent with the settled law of the state since the act of 1791 (5 Stat. 170), also incorporated into the Gen-eral Statutes (ch. lxxxii, § 9), and therefore inoperative.

16. Action was instituted by a mortgagee to foreclose his mortgage upon descended lands of the mortgagor, and a party defendant claimed that

these lands were covered by the lien of a judgment obtained by him against the ancestor; this defence was overruled and the mortgage held to be the prior lien. *Held,* no adjudication upon the rights of such defendant as a bond creditor of the ancestor binding upon him in action afterwards brought by other creditors of the ancestor to subject these lands to the payment of her debts.

17. And such mortgagee having become the purchaser at the sale in this foreclosure suit, but not until after the action of the ancestor's creditors was instituted, the mortgagor was not out of possession before action brought.

18. But was out of possession as to a creditor of the ancestor not a party to the original complaint, but brought in by a call to creditors under an amendment, subsequent to the sale, converting the action into a proceeding to marshal the assets of the ancestor's estate, notwithstanding the foreclosure decree saved the rights of the creditors first suing.

19. Two or more creditors of a deceased ancestor cannot join in one action against the heir-at-law to subject the lands descended to the payment of the debts of the ancestor.

20. The proceeds of sale of the property should be applied, after the payment of the ancestor's creditors (where so liable) to the mortgages of the heir, in the inverse order of their dates.

Before THOMSON, J., Charleston, June, 1880.

This is the second appeal in this case; the first will be found reported in 12 *S. C.* 9, and should be read in connection with the opinion here.

The report of the referee, G. D. Bryan, Esq., the Circuit decree, and the opinion of this court fully state the case. The referee's report was as follows:

This case having been remanded to the Circuit Court by the Supreme Court, has been again referred to me, by an order of date, June 26th, 1879, as follows:

"Ordered that the decree of the Supreme Court herein be filed with the clerk of this court, as the decree and judgment of this court; and that the decree heretofore rendered herein be set aside where inconsistent therewith and opened in other respects to the extent necessary to modify it in accord ance therewith. Ordered further, that George D. Bryan, the referee heretofore appointed in this action, do inquire into such matters of fact or law as are opened by the said decree, and that he do report thereon, with the testimony taken before him, with leave to report any special matter to this court. It does not appear to the court that the alienation of a part of the real estate necessarily operates to bar the equity of redemption under the

circumstances in this case, and that the creditors of Mary Raymond have a. possible interest therein. The motions to dismiss the complaint as to A. G. Rice, and the estate of Poincignon for this and other reasons are refused without prejudice."

I beg leave respectfully to report that I have held a number of references under this order, at which all the parties to the cause were before me, and have taken testimony which is filed herewith.

Upon a motion made to restrict the new evidence as to whether, prior to the commencement of this action, the mortgages set up by way of defence to sustain the plea of *bona-fide* alienation as against the rights of the creditors of the ancestor, commenced to operate by way of transferring the legal title from the mortgagors to the mortgagees by reason of the mortgagors being out of possession at any time prior to such suit, I ruled that under the decision of the Supreme Court, the testimony should not be restricted to this point alone, but that evidence would be admitted upon any point made in the case. To this the plaintiff excepted.

I. The complaint in this case was filed on January 17th, 1876, by John D. Warren, on behalf of himself and all other creditors of Mary Raymond, deceased, who should come in and contribute to the expense of this action. The object of the bill was to subject the real estate in the hands of H. H. Raymond, the heir of Mary Raymond, deceased, to the bond debts of Mary Raymond. The prayer was for judgment for the amount of the debt due to the plaintiff, for an injunction against numerous parties holding mortgages of the heir and judgments against him, for the marshalling of the assets of the estate of Mary Raymond, and the calling in of her creditors to prove their claims in this cause, for the appointment of a receiver of her estate, for the distribution of her estate according to law, and for such other relief as might be proper. The parties defendant in this action are H. H. Raymond, the heir-at-law, and after his death his heir-at-law and his executor, and S. Lord, Jr., administrator of Mary Raymond, deceased, and the creditors holding the mortgages of H. H. Raymond, the heir-at-law, on the property of the ancestor,

and those holding judgments against him the said H. H. Raymond.

On May 8th, 1876, a motion for preliminary injunction and receiver was made, but was refused, and notice of appeal was given by the plaintiff, but the appeal was not prosecuted, as an order of injunction was subsequently granted as hereinafter stated.

On May 8th, 1876, the court granted leave to the plaintiff to amend his bill by inserting allegations as to the insolvency of H. H. Raymond, and ordered a reference of the case to the undersigned to take an account of the debt due to the plaintiff on the bonds set forth in the complaint, with instructions to call in by advertisement all the creditors of Mary Raymond, to prove their claims against her estate, on or before June 10th, 1876, and to report a correct statement of such debts with their relative priorities, and also to inquire into all the issues of law and fact raised in the pleadings, and especially of the estate, real and personal, of the said Mary Raymond. No exception was taken to this order. The creditors of Mary Raymond were called in by notice as directed and inquiries as required by the order duly made. It was admitted that Mary Raymond left little or no personal property. The real estate set forth in the bill comprised practically her sole estate.

Henry H. Raymond, the heir of Mary Raymond, died May 31st, 1876. Rosalie Raymond, his heir, was duly made a party to the cause, and by S. Lord, Jr., her guardian *ad litem*, answered the complaint. On February 3d, 1877, the defendant Wm. M. Thomas was by order in this case enjoined from proceeding with the sale of the Waverly House, then advertised for sale under a levy under his execution. On February 20th, 1877, Samuel Lord, Jr., executor of Henry H. Raymond, and administrator of Mary Raymond, was made a party defendant, and answered that he had received no assets of his or her estate to be administered. On February 21st, 1877, a decretal order was made in this cause, enjoining the defendants and all others, the creditors of Mary Raymond, and Henry H. Raymond, from proceeding further in any action then commenced, or from instituting any proceeding other than in this action, to

enforce or collect any claim or demand against the property mentioned in the complaint, or against the defendant Henry H. Raymond.

The creditors of Henry H. Raymond were called in to prove their claims on or before April 5th, 1877. The real estate was ordered to be sold; the referee was directed to inquire into the liens claimed on said property in connection with the other matters and issues referred to him; the equity of redemption of all parties was barred, and all questions both as to the validity of plaintiff's claim, or otherwise, were transferred from the property to the fund. This order was moved by the plaintiff and consented to by Messrs. Simonton & Barker, Buist & Buist, A. G. Magrath, J. Barrett Cohen, H. L. P. Bolger, Asher D. Cohen, Pressley, Lord & Inglesby, and DeSaussure & Son, representing certain of defendants herein. On April 12th, 1877, the property was offered for sale, and with one exception, to wit, the property at the corner of Pitt and Wentworth streets, was bid in by the parties holding mortgages thereon. On December 7th, 1877, the first report of the undersigned, as referee, was filed, and on December 11th, 1877, plaintiff, by A. T. Smythe, his attorney, filed exceptions to his said report, that the referee had erred both in his conclusions of law and fact as therein reported.

Since the remanding of this case to me, to wit, on the — day of July, 1879, Messrs. Simonton & Barker called attention to the fact, that Peter Thomas, Stephen Thomas, Mary L. Thomas, and William Henry Thomas, were necessary parties to the proceedings, and asked that such proceedings be amended, and that they be joined as defendants. I so ruled, and the parties have duly filed their answers herein. To this ruling of the referee, the defendant, William M. Thomas, excepted.

II. The following claims against the estate of Mary Raymond have been proved before me:

*First.* The three bonds of the plaintiff, John D. Warren, set up in the complaint, amounting with interest, on January 1st, 1877, to six thousand four hundred and fifty-one 46-100 dollars. These were the joint and several bonds of Mary Ray-

mond, with Henry H. Raymond as security. They were past due at the death of Mary Raymond, but interest had been paid on them up to that time. Warren testified that when he loaned her the money, it was understood that as long as the interest was paid he would not ask for the principal. After her death the interest was paid by H. H. Raymond, and a payment was made as late as November 20th, 1874, on account of the interest on these bonds. On November 10th, 1875, Mr. Raymond accepted Mr. Warren's draft for six hundred and ten dollars, giving receipt, when paid, to be in full of interest on his bonds to January 1st, 1875. This draft matured on January 5th, 1876, and was not paid. This action was commenced on January 17th, 1876. Mr. Warren, the plaintiff, does not live in Charleston, but in Colleton county, and testifies that he had no actual knowledge of the mortgages by Henry H. Raymond. He states that he regarded Mr. Raymond as a man of large means, but that he always looked to the estate of Mrs. Mary Raymond for the payment of his debts.

*Second.* The bond held by B. J. Whaley, trustee, for forty-two hundred and forty-one dollars, which is also the joint and several bond of Mary Raymond and Henry H. Raymond of date June 1st, 1859, payable on June 1st, 1864, with interest from May 31st, 1876, the date of H. H. Raymond's death. Henry H. Raymond was entitled to the interest of this bond during his lifetime, and the trustee claims interest only from the day of his death. Some question has been made as to the time when this bond was proved before the referee. I do not see that it is material. Mr. Whaley was examined on May 4th, 1877, as a witness, but not to prove the bonds. No exception has, up to this time, been taken as to the time when the bond was proved in the case, and I report as finding of fact that it was properly and duly proven in the cause before me.

*Third.* The judgments of William M. Thomas which are fully set out in my former report herein. I am requested to find the fact that on November 29th, 1873, the execution of William M. Thomas was levied on the Waverly House; and I so find.

These are the only claims against Mary Raymond proved before me. The mortgage to Charles Astor Bristed, mentioned in a former report, has been foreclosed, and the property sold separately, and there is no proof before me of any deficiency. The several mortgages and judgments against Henry H. Raymond have been fully stated in my former report.

The bonds held by the plaintiff were past due many years before the death of Mary Raymond. The last receipt on the bond, for twenty-five hundred dollars from Mrs. Raymond, was on November 27th, 1861. All the receipts from this time until December, 1869, were to M. and H. H. Raymond, and all receipts from December, 1869, were to H. H. Raymond. On the one for sixteen hundred dollars there appears in May, 1866, a receipt to Mrs. Raymond for three hundred dollars, on account, and receipts from M. and H. H. Raymond of dates January 31st, April 1st, and December 4th, 1867, and January 14th, 1869. Subsequent receipts are found to H. H. Raymond for payments on account of said bond. And on the bond for fifteen hundred dollars there appears a receipt to Mr. H. H. Raymond of one hundred dollars on account of interest, and five hundred dollars on account of principal of said bond. I am requested to report, as matter of fact, that in a certain cause in bankruptcy, *In re* William McLean, bankrupt, there appears the name of William L. King, agent, as one of his creditors for rent. William L. King, agent, accepted the composition in that case, and gave his receipt for the amount offered in compromise. The order calling the meeting to submit the proposition to the creditors in this case was of date February 10th, 1877. The resolution accepting the composition was on February 23d, 1877, and was signed, amongst others, by W. L. King, agent, representing one hundred and seventy-five dollars. The order to show cause why the composition should not be confirmed was dated March 23d, 1877, and the order confirming the same was dated March 29th, 1877.

The mortgage of Mary Raymond to William M. Thomas was recorded on September 21st, 1863, in the clerk's office of

Greenville county. William M. Thomas testified that the only proceedings in the United States Court to subject the judgment of Thomas proved in this case, to the bankrupt estate of William M. Thomas, is the proceeding entitled Joseph Glover against William M. Thomas and A. Blythe, assignee, which proceeding has been dismissed by the District Court, and there has been no appeal from the order dismissing the same.

III. In construing the opinion of the Supreme Court and the order of reference under which I am acting, it seems to me that the only question upon which a new inquiry is desired, is whether, as to any of the mortgages in question, the mortgagor was out of possession. The decree herein, confirming *Simons* v. *Bryce,* has decided that a mortgage is not an alienation under the statute, so as to defeat the claim of the bond creditors of the ancestors, and that to amount to an alienation the mortgagor must be out of possession, so that the Act of 1791 does not apply. This was not the view of the referee and the court below, but the Supreme Court says: [Here follows an extract from the former opinion as found on page 25 of 12 *S. C. Reports.*]

It has been urged in argument, however, that while the Supreme Court has decided that a mortgage is not an alienation, and, therefore, the defendants, mortgagees, cannot claim as alienees the benefit of the exemption under the statute, that they are entitled to be protected as *bona-fide* purchasers for valuable consideration without notice, and that one object of the Supreme Court in remanding the case as it has done, is to enable them, the defendants, mortgagees, to make such claim before the Circuit Court, and there derive the benefit thereof.

I cannot agree with this view. In the first place, had the Supreme Court desired to give to the mortgagees the benefit of any such claim, there was no necessity of remanding the case to the Circuit Court for that purpose, as the facts on that point were all before it. But in the next place it seems to me that the Supreme Court has definitely passed on the position contended for, and has decided the question adversely to the defendants, mortgagees. In my former report, in consider-

ing the point whether the bond of the ancestor took precedence of the mortgages of the heir, I found as follows : " This question is settled by the recent decisions of the Supreme Court of this state, in one of which, *Richardson* v. *Chappell*, it is held that under the statute 3 *and* 4, *W. and M.*, and 5 *George II.*, *Chap. VII.*, lands purchased from a devisee are not liable for the debt of the devisor, when the purchase was *bona fide*, for valuable consideration and without notice; and in the other, *Haynesworth* v. *Bischoff*, it is held that a mortgagee of lands is a purchaser within the meaning of the rule which protects a purchaser for valuable consideration without notice." This finding was affirmed by the Circuit Court, but the Supreme Court held otherwise, saying: " The fundamental proposition upon which the Circuit decree rests is at variance with the recent decision of this court in *Simons* v. *Bryce*." The Court then proceeds to reconcile the decision in case of *Simons* v. *Bryce*, with the decisions in the cases of *Chappell* v. *Richardson*, and *Haynesworth* v. *Bischoff*, and after commenting on the doctrine of purchaser without notice for valuable consideration; as laid down in the last-mentioned case, says : " This was far from involving the question of the legal defence of alienation under the statute of 3 *and* 4, *W. and M.*, nor does it preclude the Court of Equity from giving the same construction to that defence as a court of law would give when arising before it from the provisions of the statute. The Circuit decree is erroneous to the extent that it rests upon the proposition just considered."

Besides this, in the case of *Simons* v. *Bryce*, after quoting from *Haynesworth* v. *Bischoff*, the Supreme Court says : " But in this case the mortgagees do not, and could not, invoke any such equitable doctrine, but rely upon the express provisions of a special statute, and by that statute they must stand or fall. The claim which they resist does not rest upon a mere equity, as in *Haynesworth* v. *Bischoff*, but it is a plain legal right; lands in the possession of an heir or devisee being liable at law for the debts of the testator or ancestor."

IV. The main question then remaining is whether the mortgagor, H. H. Raymond, was as to any of these mort-

gages out of possession at any time prior to the commencement of this action. I shall consider these mortgages seriatim.

*First.* The mortgage to Mrs. Anna Dora Fleming, so far as it covers 280 King street, and the mortgage to William J. Gayer, so far as it covers the house and lot in Wentworth street. There is no evidence before me that the mortgagor was out of possession in either of these cases, and no claim to that effect is made. Mrs. Fleming claims, however, that inasmuch as the money loaned by her went to pay up a prior mortgage to Hannah Butterfield, dated October 21st, 1869, she is entitled to the benefit of that date and to the amount of that mortgage in the event that the mortgages contribute in inverse order to the payment of debts of Mary Raymond. I find that she is not so entitled.

*Second.* The mortgage held by Mrs. Eliza S. Hopkins, Mr. Brawley, solicitor of Mrs. Hopkins, after testifying as to his intercourse with H. H. Raymond with reference to this property, states that there was no change of possession, and I so find as matter of fact.

*Third.* The mortgage held by Douglas Nisbit, guardian. In this matter the decree for foreclosure had been signed on January 6th, 1876, eleven days prior to the commencement of this action. No sale was made, however, under such decree until June 6th, 1876, with full notice of this action then pending, and to which Nisbit was in fact a party. The property was bid in at the sale by Nisbit, the mortgagee. I find that as to this mortgage the mortgagor was not out of possession prior to the commencement of this action.

*Fourth.* The mortgage held by Mrs. Ellen Barker, trustee, on 262 King street. There is no evidence that the mortgagor was out of possession of the mortgaged premises, and I so find. It is contended, however, that the premises were mortgaged a second time to Mrs. Anna Dora Fleming, and, therefore, the equity of redemption of the mortgagor was gone, and the mortgagor was out of possession. Without entering into a discussion of this point, the statutes, when construed together, do not warrant any such interpretation, and the law has long since been repealed as obsolete.

*Fifth.* The mortgage held by John C. Ojeman and Albert Bischoff, executors of Otjen. The same claim as to the legal effect of a second mortgage, made in this instance to W. J. Gayer, is pressed here; but, as I have already stated, the position is, in my opinion, untenable.

Evidence, has, however, been introduced by these defendants, mortgagees, which, they claim, proves that so far as W. J. Gayer, mortgagee, was concerned, H. H. Raymond was out of possession. The assignments of the rents of these premises, by Raymond to Gayer, has been discussed by the Supreme Court in its opinion as follows: [Here follows extract from former opinion, 12 S. C, 25.]

Under this opinion I am to find "*the act and intent of the parties,*" and whether "the mortgagor surrendered possession." Mr. Gayer's testimony was objected to under Section 415 of the code. He is a party to the action, and, in my opinion, comes within the terms of that section. His testimony, however, is only concerning his acts and intents. There is nothing to show that Mr. Raymond ever knew or consented to or understood this alleged possession. From all the testimony it appears that Mr. Raymond, Mr. Gayer, and Mr. W. L. King were close and intimate friends. Mr. King collected rents for Mr. Raymond for other property. When the mortgage was given, Mr. Gayer testifies that Raymond " gave him the paper referred to" to fully secure him, and for the tenants in his houses to pay over the rents to him. The assignment itself, the only evidence now of what was the intent of Mr. Raymond, recites that it is given "in order to the further security of his bond." Mr. Gayer continued the collection of the rents, through Mr. King, who collected rents for other of Raymond's property, as agent. He never mentioned to Mr. Raymond that he was doing that which might cause him to think he exceeded what was expressed in the paper assigning the rents, and endeavoring to take possession of the property. He never returned the property for taxation, which he says he would have done had he considered it his own, but did pay part of the insurance on it. Mr. King's testimony is very vague as to Mr. Raymond's knowledge of what was being done, and goes only

to the effect that he collected the rents for Mr. Gayer, turning it over to him, and is under the impression that Mr. Raymond knew that the rents for 342 and 344 King street were being paid over by him to Mr. Gayer. He made one lease, as agent for Mr. Gayer, and as agent made a composition in bankruptcy with one of the tenants on account of rent due, and paid the money to Mr. Gayer. This composition, however, was not made until February, 1877, after this action was commenced.

The whole testimony shows that Mr. Gayer did just what, under the assignment, he had a right to do, and that is to collect and secure the rents from the King street property, and shows nothing more. He employed an agent, and the payment of the rent to him, if known by Raymond, was only what was contemplated by the assignment. There is no allegation or proof that either Gayer or King, his agent, was acting adversely to Raymond, or that Raymond ever contemplated or agreed to anything more than the collection of the rents and the retaining of the same by Gayer. In my opinion there is no testimony, even admitting that of Mr. Gayer, to prove that the mortgagor, Raymond, surrendered possession of the mortgaged premises to the mortgagee, Gayer, or that it was the act and intent of Raymond, as one of the parties, so to do, and I so find and report.

*Sixth.* The mortgages held by the executors of Poincignon and by A. G. Rice. It is insisted that, under the opinion of the Supreme Court, all questions as to the mortgage of Rice are decided, and that the mortgaged premises are free, and discharged from all claim. A motion was made before the Circuit Court to dismiss the complaint as to the defendant, Rice, but was refused, as set out in the order referring the case back to me. In my opinion, the matter is before me for examination and report. The Supreme Court bases its decision in this matter upon the findings of fact in my former report, and say: " These findings do not appear to have been excepted to, and must stand as final." As heretofore reported, the plaintiffs excepted both to the findings of fact and law in my former report herein, and duly filed such exceptions.

Although the question of alienation may have been passed

upon, it remains to be decided whether it was such an aliena-
tion under the statute as to defeat the creditors of the ancestor.
The taking possession by Mr. Rice consisted in his attorneys
notifying the tenants of the Waverly House and stores not to
pay rent to any one but themselves, giving to them as the rea-
son the power to enter contained in the mortgage. It is ad-
mitted that at the time this notice was given, the attorneys of
Mr. Rice knew of the Warren debt, and that suit was to be
brought thereon, and that they were hastened by such knowl-
edge in giving such notice and in attempting to take possession.
When the mortgage was taken by Mr. Rice, his attention was
called to the judgment of W. M. Thomas, and under the
advice of counsel he declined to lend as much as he otherwise
would have done, had not the Thomas's judgment been a cloud
upon the title. The purpose of taking possession was to defeat
the Warren debt, of which the attorneys for Rice had notice,
and even an absolute conveyance made under such circumstances
would be void. *Lowry* v. *Pearson*, 2 *Bail.* 324; *Ashmead*
v. *Hean*, 13 *Penn. St.*, 584.

After a careful consideration of the questions connected with
the property mortgaged to Col. Rice, and the executors of
Poincignon, I find that they were not *bona fide* aliened before
action brought, and that the mortgagor was not out of possession
so as to defeat the claims of the creditor of the ancestor.

V. It is claimed that the plaintiff should not recover in a
Court of Equity, because he has been guilty of laches in not
sooner bringing his action; that if he had, these mortgages
would not have been given and the mortgagees would not have
been misled by his silence. The claim of the plaintiff is a legal
demand, such as Courts of Equity always enforce and recognize.
There is no presumption of payment. The interest was paid
up to the date of Mrs. Raymond's death, and afterwards until a
short time before action brought. These mortgagees knew
that they were dealing with an heir as to the lands descended,
with property of an estate which had not been settled up, and
that there were bond debts of the ancestor outstanding, held by
Thomas and Bristed. No *devastavit* has occurred by reason of
the plaintiff's not bringing suit heretofore, as there was no per-

sonal estate from which the debt of plaintiff might have been paid. This point has been decided, however, in the case of *Simons* v. *Bryce*, above referred to. In my opinion, therefore, the objection is not well taken.. The claim of the plaintiff and other bond creditors is a plain, legal right. He was not bound to sue sooner than he did, and his debt being valid and of force, cannot be set aside on the ground of *laches*, and I so find.

VI. It is admitted that in contributing to the payment of the debts of the ancestor, the lands last mortgaged shall be first liable for such debts, and I so find.

I therefore respectfully report from the above findings of fact and of law, that the plaintiff, John D. Warren, and B. J. Whaley, trustee, and the defendant, W. M. Thomas, having established bond debts of the ancestor, Mary Raymond, are entitled to be paid out of the proceeds of the property set forth in the pleadings herein, and mortgaged by Henry H. Raymond, her heir, and that in the application of such proceeds the property last mortgaged be first exhausted, and so in inverse order until the said bond debts be fully paid.

The case came up before Judge Thomson, in June, 1880, on exceptions to the referee's report, and in March, 1881, his Honor filed the following decree:

The referee, in his second report, states: "These are the only claims against the estate of Mary Raymond, proved before me." These are the three bonds of the plaintiff, Warren, the bond held by B. J. Whaley, trustee, and the judgment of William M. Thomas. The presumption is, that these are the only debts against her estate, and that the various bonds of H. H. Raymond, secured by mortgages, are his individual debts. That, in fact, the contracting of the debts of H. H. Raymond, was contemporaneous with the dates of the mortgages, which were all given after the death of Mary Raymond. And so of the judgments recovered against him.

A glance at this condition of the case discloses the vantage ground held by the creditors of Mary Raymond. Generosity must yield to right, and the creditors of Mary Raymond are entitled to payment from her estate before the creditors of H.

12

H. Raymond, who takes by descent, can claim any part of her property. This view must prevail, unless the creditors of Mary Raymond have, by some act of theirs, lost their rights, or the creditors of H. H. Raymond have acquired by his or their act some right which enables them to hold as valid the liens they have obtained. This they allege they have done, and claim that the mortgages to them are alienations under the Statute of William and Mary, and that they are entitled to hold the property by virtue of this law.

There is a decision of the Supreme Court in this case, which, in great part, is directory. It becomes, therefore, the duty of the Circuit Court to be guided by that decision, and ascertain what has been determined. The first, and, certainly, by far the most important point, is the question, whether a mortgage is an alienation under the Statute of William and Mary. In speaking of the mortgage to Gayer, the court says: " If, on the other hand, the mortgagor surrendered possession of the mortgaged premises to the mortgagee, then the mortgage must be regarded as an alienation. As the true issues were not presented under the view taken by the referee and the Circuit Court, it appears advisable *that this question of fact* should be passed upon by the Circuit Court under the view presented herein. The same question is raised as to other defendants, and is subject to the same observations, and should be disposed of in like manner."

It is obvious, then, that as to all the defendants, who are mortgagees (one excepted), a question of fact must be decided by the Circuit Court, that is, Was the mortgagor out of possession of the mortgaged premises at the time of the commencement of plaintiff's suit? to wit: Was the alienation complete, so that the mortgage deed had finished its office as a security, and had become, by its tenor and the act of the parties, a simple conveyance? In other words, the condition of the mortgage deed must, by the acts or agreement of the parties, become satisfied or extinguished, and leave the conveyance to have its full effect, according to its terms. A surrender of possession to complete an alienation can only be by act of the mortgagor, who declares thereby that the condition of the mortgage shall

be regarded extinct, and the conveyance absolute. The referee in his report enumerates the several mortgages given by H. H. Raymond, and finds as a fact that the mortgagor was in possession of all the realty included in them.

Two of these mortgages, however, are affected by facts which are not found in connection with the others. In the case of the mortgage to W. J. Gayer, it is said that the mortgagor "*in order to secure* the mortgage given by H. H. Raymond to W. J. Gayer, required the tenants of the property covered by the said mortgage to pay over the rents thereof to the said W. J. Gayer." So far from there being a surrender of possession with a view to terminate the mortgage, the intent of the parties was by paying the profits of the property to the mortgagee to make the security more ample. This surely was no surrender of the possession.

As to all these mortgages, including that to executors of Poincignon, and excepting that of A. G. Rice, the court concurs in the findings of the Referee, that the mortgagor was in possession of the property mortgaged.

The mortgage to A. G. Rice stands upon a different ground from that of the others. The question of possession by the mortgagor in relation to the other mortgages, was sent back to the Circuit Court, that certain issues of fact might be considered by the court. As to this mortgage, the Supreme Court declares that "the findings of fact of the referee are sufficiently full to present the question." The court says, it is clear "that the mortgagor was out of possession . . . at the time of the commencement of the present suit." The court then proceeds to state that where a power of entry is given upon condition broken, to take and hold possession with the rents and profits, the mortgagor, this power being exercised, is "clearly out of possession by his own act," and in such case the mortgage has the effect of one at common law, and constitutes an alienation under the Statute of 3d and 4th William and Mary. "As to such alienated premises, the plaintiff cannot follow the land." This language is plain enough to show that the Supreme Court decided the case as to the mortgage of A. G. Rice. And their explicit language that the findings of fact by the referee—*not*

*excepted to*—must stand as final, with their conclusions of law, must be obligatory upon the Circuit Court.

The claim of W. M. Thomas originated in a note under seal given by Mary Raymond for $7000, dated August 26th, 1863, and to secure it she gave a mortgage of same date. Much dispute had arisen touching this debt as to its character—whether a judgment with a lien or without, and how it should rank with other debts. The Supreme Court, after discussing the character of the claim, says: " That at all events the decree of Chancellor Carroll must be regarded as liquidating the debt in favor of W. M. Thomas against Mary Raymond during her lifetime." So that if the debt by specialty is not merged in a judgment, the sum is ascertained upon the basis of the original contract. This places the debt in the same rank as the debts of the plaintiff and Whaley.

But it is claimed that the debt is due in judgment, and should rank as such with the rights of a judgment. Is it a debt by judgment, and was there a judgment in the lifetime of Mary Raymond? The Supreme Court declines to give it the rank of a judgment, and whilst refraining to pronounce it no judgment, as a subject not properly to be considered by the court, by its reasoning manifestly leads to such conclusion. As between creditors in a creditors' suit, questions as to the rank of the several debts presented may be made. Manifestly, whilst abstaining from an opinion that the debt of W. M. Thomas is not in judgment, the court refuses to assign it this rank, but places it as a liquidated debt by specialty. The dissenting opinion or note of Mr. Justice Haskell is full of meaning, evidently implying that the matter had been considered by the court, and that he was of opinion the debt should rank as a judgment. It is enough that the opinion of the Supreme Court has been expressed with sufficient clearness for the referee and Circuit Court to conform to such view.

The main question in this case is, Shall the debts of Mary Raymond, as proved before the referee, be paid in full before the creditors of H. H. Raymond receive any part of theirs from the estate which passed to him by descent? This is the view of the referee, and, with the exception of the property

mortgaged to A. G. Rice, the Circuit Court concurs in that result. As to the judgments against H. H. Raymond, all obtained, as appears, after his mother's death, they never could be more than a lien upon his interest in the property formerly his mother's. The realty whilst in his possession was held in trust for her creditors, if needed for payment of debts. The questions made in favor of the mortgagees as alienees could not be made for them.

In the present condition of this case, the court has no information which would enable it to order a sale or disposition of the property for the payment of the debts of plaintiff, of B. J. Whaley, and of W. M. Thomas. This much, however, may be declared, that these debts stand in the same rank and are to be paid in full from the property of Mary Raymond, of which she was the owner at her death—or *pro rata*, if there be not property enough to pay them in full.

An attempt to declare the rights of the creditors of H. H. Raymond by mortgages and judgments would certainly be premature. The conduct of the case in these and other particulars must be governed by orders hereafter obtained.

It is ordered, adjudged, and decreed, that the exceptions of the several parties to the second report of the referee be overruled, and the said report be made the judgment of the court in all particulars, except that part relating to the debt or mortgage of A. G. Rice. The objection that this question has been decided by the Supreme Court is sustained, and the report of the referee upon this point overruled.

The exceptions to this decree are too voluminous (sixteen pages) for insertion, and the points raised by them are clearly stated in the opinion.

Mr. *A. T. Smythe*, for plaintiff.

Messrs. *Campbell & Whaley*, for Whaley, trustee.

Mr. *W. M. Thomas*, for himself.

Mr. *J. B. Cohen*, for executors of Otjen.

Messrs. *DeSaussure & Son*, for executors of Poincignon and Nisbit, guardian.

Mr. *A. D. Cohen*, for Anna D. Fleming.

Messrs. *Simonton & Barker*, for Rice, and Barker, trustee.

April 28, 1882.—The opinion of the court was delivered by

MR. JUSTICE MCGOWAN.—Mrs. Mary Raymond died intestate in February, 1869, possessed of a considerable estate, consisting for the most part of valuable improved lots in the city of Charleston. She had little personal property, and at first there was no administration on her estate. She left one son, her only child and heir, Henry H. Raymond, who, upon the death of his mother, took possession of all her estate, without paying her debts. He was himself largely indebted, and to secure his creditors, from June, 1870, to July, 1875, he executed sundry mortgages upon the real estate of which his mother died seized: and the numerous complications of the case have arisen in different ways out of the struggle whether the real estate which belonged to Mary Raymond at her death, and went into the possession of H. H. Raymond as her heir, shall go to the payment of the debts proper of the mother or the son, of the ancestor or the heir.

On January 17, 1876, John D. Warren, as owner of certain joint and several bonds of Mary Raymond, and H. H. Raymond, commenced this action against H. H. Raymond, there being at that time no administration upon the estate of Mary Raymond, alleging that Mary Raymond died seized of considerable real estate, which went into the possession of H. H. Raymond, who executed sundry mortgages of the said real estate, to secure his creditors, leaving his mother's debts unpaid; that a number of these mortgagees had instituted foreclosure suits, and that separate sales of the mortgaged property would result in its sacrifice; that there were also a number of judgment creditors of H. H. Raymond, some of whom were seeking by separate proceedings to sell the property above described; that debts due the plaintiff and other creditors of Mary Raymond

should be paid from her estate, in preference to any due by
H. H. Raymond by judgment, mortgage, or otherwise. Plain-
tiff prayed judgment for the debt due him, that the creditors
of Mary Raymond should be called in; that the property
should be sold, receiver appointed, etc.

William M. Thomas, among others, was made a defendant
and answered, claiming that he had recovered judgment against
Mary Raymond in her lifetime for $3265.62, which was duly
enrolled January 30, 1868; that execution thereon was lodged
in the sheriff's office of Charleston, December 16, 1868, and
that after a credit, the balance of said judgment was still due.
The other defendants holding mortgages of H. H. Raymond,
with more or less of difference in their respective claims, in-
sisted that the debts of Mary Raymond should not be paid in
preference to those of H. H. Raymond, out of the real estate
of which she died seized, which, by operation of law, descended
at her death to H. H. Raymond, her heir; that he *bona fide*
aliened the same by way of mortgage to them respectively be-
fore action brought against him for the debts of his mother
Mary, and that they were purchasers for valuable consideration
without notice. They denied the validity of the judgment of
William M. Thomas, and alleged that it belonged to A. Blythe,
as assignee in bankruptcy.

On May 8, 1876, a motion for preliminary injunction was
made and failed, but the court granted to the plaintiff leave to
amend his complaint charging the insolvency of H. H. Ray-
mond, and appointed George D. Bryan, Esq., special referee,
with instructions to call in by advertisement the creditors of
Mary Raymond.

Henry H. Raymond died testate May 31, 1876, and on Feb-
ruary 20, 1877, Samuel Lord, Jr., qualified as his executor, and
answered for his only child and infant heir, Rosalie C. White,
*nee* Raymond, and administered on the estate of Mary Ray-
mond. These new parties having been made, the proceedings
assumed substantially the double aspect of an action in the na-
ture of a bill to marshal the assets of Mary Raymond, and to
make land in the possession of the heir liable for the debts of
the ancestor.

On February 3, 1877, the defendant, Thomas, was enjoined from proceeding with the sale of the Waverly House, then advertised for sale under levy of his execution, and on February 21, 1877, a decretal order was passed by consent enjoining all creditors of H. H. Raymond, ordering them to be called in, directing all the mortgaged property not already in the court for foreclosure to be sold, and the proceeds of sale instead of the lands to await the event of the litigation.

The referee then called in by publication the creditors of both Mary Raymond and H. H. Raymond to present and prove their demands. The following were presented against the estate of Mary Raymond:

*First.* John D. Warren, the plaintiff, being the claim on joint and several bonds of Mary Raymond and H. H. Raymond, on which the action was founded.

*Second.* W. M. Thomas, claim of judgment before referred to, as to which, being made a defendant he had answered asking affirmative relief. It seems that this alleged judgment against Mary Raymond was rendered at Greenville by Chancellor Carroll, in a suit to foreclose a mortgage January 22, 1868. The decree ordered that if the amount found due by the commissioner in equity was not paid before salesday in March, 1868, that the lands should be then sold, the purchase money credited, and the decree enrolled for the balance. The decree purports to have been enrolled January 30, 1868, before the day of sale, and the land having been sold in December, 1868, execution thereon was issued subject to the credit for the purchase money of the land, and lodged with the sheriff of Charleston, December 14, 1868.

This case went to the old Appeal Court. 15 *Rich.* 86. It appeared from the record in the case that the decree was upon a sealed note or bond of Mary Raymond, secured by the mortgage aforesaid upon a house and lot in Greenville, and that after the death of Mary Raymond, H. H. Raymond was made a party defendant, under the supposition that he was the executor of his mother, and various proceedings were had against him, and finally, September 20, 1872, Judge Orr rendered judgment against him as executor *de son tort* of Mary Ray-

mond, from which there was an appeal to the State Supreme Court, which was dismissed. 4 *S. C.* 352. From this decision an appeal was taken to the Supreme Court of the United States, and the case is reported in 91 *U. S.* 712. Judgment against H. H. Raymond was entered at Greenville November 17, 1873, pending the appeal to the Supreme Court of the United States, and a transcript lodged in Charleston November 29, 1873, and execution issued and levied on the Waverly House as the property of H. H. Raymond.

*Third.* B. J. Whaley's claim as substituted trustee under marriage settlement of H. H. Raymond and his wife, on joint and several bond of Mary Raymond and H. H. Raymond, June 1, 1859, payable in July, 1864. This bond was in the possession of H. H. Raymond from 1864 to 1875, placed there by the trustee for safe keeping. The trustee was not a party to the proceedings, and had made no effort to collect the same, and the claim did not appear until it was presented under the call by advertisement in the case. No payments were credited, but the interest is only claimed since the death of H. H. Raymond. The precise day on which it was presented and proved did not appear, but the referee reported the claim as proved in his report of December 7, 1877.

It seems that the claim of the executors of Charles Astor Bristed against Mary Raymond had been paid by foreclosure of mortgage given by Mary Raymond, and there was no claim for any deficiency.

The following claims were presented against the estate of H. H. Raymond:

1. Ellen Barker, trustee, debt secured by mortgage bearing date June 28, 1870; 2. Maria S. Hopkins, debt secured by mortgage bearing date Nov. 25, 1870; 3. Albert Bischoff, as surviving executor of John C. Otjen, debt secured by mortgage bearing date Jan. 15, 1872; 4. Douglas Nisbit, guardian, debt secured by mortgage bearing date July 15, 1872; 5. Anna Dora Fleming, debt secured by mortgage bearing date July 1, 1873; 6. Executors of E. Poincignon, debt secured by mortgage bearing date August 14, 1873; 7. Wm. M. Thomas, judgment before referred to as recovered at Greenville against

H. H. Raymond as executor *de son tort* of Mary Raymond. This judgment, as stated, was entered at Greenville, Nov. 17, 1873, pending appeal to the Supreme Court of the United States, and what purported to be a transcript of the judgment was lodged in Charleston county Nov. 29, 1873, and levied on the Waverly House. 8. A. G. Rice, debt secured by mortgage bearing date June 1, 1875; 9. W. J. Gayer, debt secured by mortgage bearing date July 21, 1875; 10. John Fisher, trustee, two judgments on demands against H. H. Raymond alone and not secured by mortgage June 8, 1874; these judgments were assigned to Samuel Lord, Jr.; 11. People's Bank of South Carolina, judgment April 6, 1875. These three last judgments were released by Mr. Lord, and the bank respectively in favor of A. G. Rice at the time of the execution of the mortgage to him by H. H. Raymond. There were other claims which need not be specially referred to.

The referee, December 7, 1877, made a report stating the facts very fully, and deciding that the Thomas judgment was a lien on all the property of Mary Raymond in Charleston and had priority over all the claims now before the court, and that the different mortgages, at their respective dates and in regard to the lands covered by them, were *bona-fide* alienations of H. H. Raymond before action brought against him. Exceptions were filed and the case was heard by Judge Wallace, who confirmed substantially the referee's report. From this decree there was an appeal to this court, which on the main point reversed the decree below holding that a mortgage of the heir-at-law of land inherited is not such an alienation within the meaning of 3 *& 4 W. & M.*, 2 *Stat.*, 533, as will defeat the claims of decedent's creditors *so long as the mortgagor retains possession ;* but when upon condition broken, the mortgagee takes possession of the land under a power given in the mortgage, or the *mortgagor is otherwise out of possession*, the mortgage thereupon operates as an alienation. 12 *S. C.* 9. The court then remanded the case for further proof saying : "In consequence of the conclusion of the referee and the circuit judge just referred to, it became unnecessary for them to decide whether the mortgages set up by way of defence to

sustain the plea of *bona-fide* alienation as against the rights of the creditors of the ancestor commenced to operate by way of transferring the legal title of the mortgagor to the mortgagees, by reason of the mortgagor being out of possession, at any time prior to the commencement of this action. There are, therefore, no such findings of fact and conclusions of law *on that point* as to bring the case before us for a final decree. . . . . We can, therefore, do no more than to lay down the principles that should govern such findings, so far as we are enabled to state them from the facts before us."

. Accordingly, the case went back to the Circuit Court, and by order was referred again to the same referee, who, under the direction of the judgment of the Supreme Court, took testimony upon the question of fact referred back and made a second very full report February 12, 1880, giving all the testimony and holding that as matter of fact the mortgagor, H. H. Raymond, was not *out of possession* of the premises mortgaged as to any of the mortgages, including that of A. G. Rice, and that Warren, Whaley, and Thomas were bond creditors of Mary Raymond, and as such entitled to the proceeds of all the lands of which Mary Raymond died seized and which were mortgaged by H. H. Raymond; the proceeds of the lands to be appropriated in the inverse order of the dates of the mortgages covering the same, and applied equally to the said claims until paid, and if not enough to pay them in full, then to be applied *pro rata* as in due course of administration.

Exceptions were filed to the report and the case came on to be heard by Judge Thomson, who overruled all the exceptions to the report, except that which assigned error in opening the judgment of the Supreme Court *in regard to the mortgage of A. G. Rice*, as to which he held that it was finally adjudicated by the Supreme Court. From this decree all parties appealed to this court. The exceptions are numerous and voluminous, and in some instances the same points are made by different parties, so that we will not attempt to follow them *seriatim*, but endeavor to consider them all in connection with the different claims.

All the property involved in this controversy belongs to

Mary Raymond and at her death descended to her heir, H. H. Raymond, who mortgaged it in different parcels to secure his own creditors; and now the question is whether it is liable for his or her debts. It is certainly the law that the property of a debtor shall go to the payment of his own debts in preference to those of any other, and the case of ancestor and heir is no exception. The creditor of the ancestor without judgment or mortgage has no lien upon the property either before or after the descent cast; but the heir is bound as of his own obligation for the debts of his ancestor. While the heir is not a technical trustee for the creditors of the ancestor as to the property cast upon him by descent, that property itself is liable for the ancestor's debts while it remains in his possession, and at least until it loses by partition or otherwise the character of assets to be administered, may be actually levied and sold under executions against the *personal representative of the ancestor.* If however, the heir, before action brought against him for the debt of the ancestor *bona-fide aliene the land,* his own personal liability to the extent of assets descended still remains; but the land itself cannot be followed by the creditor of the ancestor into the hands of the innocent alienee. It thus appears that the important point is whether there has been *bona-fide alienation* by the heir *before action brought.* The former judgment in this case, following decisions previously made, decided that a mortgage alone, which under our law is generally a mere security for a debt, is not such alienation as is contemplated by the *Statute of* 3 & 4 *W. & M.,* 2 *Stat.* 533.

To constitute such an alienation it is necessary that the *mortgagor should be out of possession,* and as the Circuit Court had not considered most of the mortgages in that aspect, the case was remanded that testimony might be taken and the judgment of the Circuit Court rendered upon that subject. " As the true issue was not presented under the view taken by the referee and Circuit judge, it seems advisable that the question of fact should be passed upon by the Circuit Court under the views presented herein. . . . There should be an inquiry as to the various *matters of fact opened hereby* and

the decree *modified* to conform to the principles already laid down. The decree of the Circuit Court should be set aside *where inconsistent herewith*, and opened in other respects, or to the extent necessary to modify it in accordance with the foregoing."

The first general question is as to what was decided by the former judgment, for we cannot reconsider what was there decided. The principle of *res adjudicata* is one of the most important in the administration of justice; for the peace and order of society require that there should be an end of litigation. As was said by a distinguished English judge: "Human life is not long enough to allow matters once disposed of being brought under discussion again; and for this reason it has always been considered a fundamental rule that when a matter has once become *res adjudicata*, there shall be an end of all question about it." The principle is that the decision of a court of competent jurisdiction upon a point which was considered or should have been considered as necessarily involved, is final and conclusive. All the questions made were decided by the former judgment, except only those which are expressly left open, and such as necessarily arise out of them.

It must be considered as decided by the former judgment that the plaintiff John D. Warren, and B. J. Whaley, trustee, are bond creditors of Mrs. Mary Raymond, not barred by laches, lapse of time, or the statute of limitations, and that action was brought by Warren and Thomas against the heir, H. H. Raymond, on January 17, 1876, and that their claims being legal demands both against Mary Raymond, the debtor, and H. H. Raymond, the heir, to the extent of assets descended, are not affected by the equitable defence of purchaser for valuable consideration without notice. Although the judgment does not so declare in express terms, we think that what it did expressly decide necessarily included also the question reargued at the bar with so much zeal and learning, namely, that inasmuch as a mortgage was an alienation in 1712, when the statute of W. and M. was made of force here, it necessarily retained, so far as the construction of that statute is concerned, the same character as an alienation down to the formal repeal

and re-enactment of that statute by the general statutes in 1872. The statute of W. and M. made no reference to a mortgage as being or not being an alienation. The words used were " *sell, alien, or make over,*" and a mortgage was at that time an alienation, for the reason that it was in effect a conveyance, and the title after condition broken was in the mortgagee. Because it happened that at that time the nature of a mortgage was such as to fall within the terms of the statute and work an alienation, it does not follow that the character of a mortgage must remain the same and that the legislature could not change it. As soon as the lawmakers saw fit to change the nature of a mortgage, as our legislature did in 1791, the question whether in its new form it fulfilled the requirements of the statute was a new question, to be decided not by what a mortgage was in 1712, but by its character as then existing.

We do not understand that Judge McIver announced a contrary doctrine in *Simons v. Bryce,* 10 *S. C.* 354. In answering this very argument he said : " It is argued that as a mortgage was undoubtedly an alienation at the time of the adoption of the statute of W. and M. (1712), that statute ought now, notwithstanding the subsequent changes in the nature of a mortgage, still to be construed as embracing a mortgage. There might be some force in this argument but for the fact that this statute has been re-enacted in the General Statutes, and the same terms, so far as the question under consideration is concerned, are retained, although the phraseology in other respects is changed." Judge McIver meant no more than to say that the argument could have no application to that case.

It must also be considered that the former judgment decided, Judge Haskell dissenting, that the decree of William M. Thomas against Mary Raymond, at Greenville, never was enrolled as a *final judgment,* so as to give a lien upon her property in Charleston. One of the elements of confusion in the case has been the anomaly of two judgments claimed to exist against different persons originating in the same demand. When Wm. M. Thomas obtained his decree against Mary Raymond in Greenville, in 1868, if it had been legally enrolled as a final judgment, notwithstanding the military orders, and execution

lodged in Charleston, any of the property of Mary Raymond might have been sold under it, whether before or after her death, in the possession of H. H. Raymond or any one else. It is not perceived why it was thought necessary to amend the proceedings after decree, by making H. H. Raymond a party, under the mistake that he was the executor of his mother. Such proceedings were, however, instituted, and after much litigation and several military orders and injunctions, judgment was finally recovered before Judge Orr, September 20, 1872, against H. H. Raymond as executor *de son tort* of Mary Raymond, and after appeal to the Supreme Court of the state, entered November 17, 1873, pending appeal to the Supreme Court of the United States. It happens that H. H. Raymond was the heir of Mary Raymond, but it does not seem to us that such an unusual proceeding against him as executor *de son tort* can be regarded as the formal action against the heir for the debt of the ancestor, contemplated by the statute of W. and M.

This judgment also failed to acquire a lien upon the property in Charleston. It was finally entered in Greenville November 17, 1873, when, by law, a judgment did not of itself constitute a lien upon real estate. Such lien could only have been acquired at that time under the code of procedure by a levy under an execution issued to enforce the judgment, and by filing a certified copy of the execution with proper certificate thereon in the office of the Register of Mesne Conveyance of the county. That was not done in Greenville. Without stopping now to consider several alleged irregularities therein, a transcript of the judgment was filed in Charleston on November 29, 1873, and execution issued and levied on the Waverly House. But still the requirements of the code necessary to give a lien were not then complied with.

It is said that the code was amended so as to make a judgment a lien November 25, 1873, and a transcript being lodged after that date, viz., November 29, 1873, became a lien without the formalities as to recording levy required by the code. The words of the amendment are, "Final judgments hereafter entered," etc.; that is to say, not the transcript of the judg-

ment but the judgment itself, which in this case was entered at Greenville before the ratification of the amendment, and therefore was not covered by it. Since that amendment, the only way in which a lien can be acquired upon a judgment rendered after March 1, 1870, and before November 25, 1873, is in the manner pointed out by that amendment, viz., by requiring the defendant to show cause "why the judgment should not be, and have a lien in accordance with its provisions." *Lynch's Code*, 120, *Adickes* v. *Lowry*, 12 *S. C.* 106, and *Carroll* v. *Tompkins*, 14 *S. C.* 223. Besides this judgment was against H. H. Raymond as executor *de son tort*, and could not be levied on lands of the intestate. As was said in *Mitchell* v. *Lunt*, 4 *Mass.* 657, "Such an executor having no character by which he can obtain license to sell lands for the payment of debts, the lands cannot in legal construction be the estate of the deceased in his hands, and that to admit the lands to be taken to satisfy a judgment recovered against him would be extremely mischievous, as no action for waste for not collecting the personal estate and paying the debts will lie against him for a devisee or heir, etc." It follows that the judgment never acquired a lien upon the property of H. H. Raymond in his lifetime, and that the Waverly House could not be legally sold under the levy made thereon.

The judgments against H. H. Raymond, including that of Thomas, were not alienations by him, and must yield priority first to the claims against Mary Raymond and then to the mortgages executed by H. H. Raymond, and as all the lands were mortgaged by H. H. Raymond, leaving no interest in him which would be liable to judgments, they practically go out of the case. It is contended that the original sealed note which was secured by mortgage of Mary Raymond to Thomas, was merged and extinguished in the decree of foreclosure rendered at Greenville against Mary Raymond by Chancellor Carroll; and that said decree being the basis of the supplemental proceedings against H. H. Raymond as executor, became in turn merged in the judgment against him as executor *de son tort*, and as Thomas has no lien upon the property he has no claim at all. We cannot accept this view, which would make the

long judicial proceedings ineffectual for all purposes, except the destruction of the cause of action they were instituted to enforce. The decree of foreclosure against Mary Raymond failed as a final judgment only for the reason that it was not legally enrolled. The subsequent irregular proceedings against H. H. Raymond as executor did not extinguish it. "Those proceedings," as stated by Judge Willard, "cannot be regarded as affecting the decree of Chancellor Carroll. They grew out of an attempt to destroy the force and effect of the decree itself, and must be regarded as extensive to it." The proceedings against H. H. Raymond as executor, so far as to make the lands of Mary Raymond liable, were misconceived, and for that reason could not merge in them the decree of foreclosure against Mary Raymond. The latter judgment against H. H. Raymond as executor *de son tort* might possibly be conclusive as to all personal property with which he had intermeddled, but not so as to the real estate of Mary Raymond. *Mitchell* v. *Lunt*, 4 *Mass.* 654; *Freem. Judg.* § 265. The claim of Wm. M. Thomas, as liquidated by the decree of foreclosure at Greenville, is entitled to stand with those of Warren and Whaley, trustee as a *bond debt of Mary Raymond.*

A. G. Rice was one of the mortgagees of H. H. Raymond, and claimed that before action brought against Raymond as heir he was out of possession as mortgagor, and therefore the mortgage to Rice operated as an alienation. It was claimed on the second reference that when the case was remanded by this court this claim was excepted from the provisions of that order and was not again before the referee, for the reason that it had been finally adjudicated here. The referee did not take that view, but being of opinion that although the question of alienation had been passed upon, "it remained to be decided whether it was such an alienation under the statute as to defeat the creditors of the ancestor." He reconsidered the case of Rice along with those of the other mortgagees, and held that the alienation to Rice was not *bona fide*, because he knew of the Thomas debt when the mortgage was taken (June, 1875), and the purpose with which he took possession in January, 1876, was to defeat the Warren debt which was then about to be

13

sued. Rice excepted, on the ground that the Supreme Court had decided " that the plaintiff could not follow the lands covered by his mortgage, which, with the proceedings had under it, alienated the lands before action brought." The Circuit judge sustained this exception, and the matter is before this court upon exceptions to his judgment.

Did the former judgment finally decide Rice's claim? In order to have a clear view of what was decided it is necessary to know what was before the court. The referee and Circuit judge had decided that all mortgages *per se* were alienations, and therefore in most of the cases the evidence had not been taken as to whether the mortgagor was or was not out of possession. The Supreme Court held that a mortgage was an alienation *only* when the mortgagor was out of possession, and under this view it was necessary to remand all the claims on the part of mortgagees in which such evidence had not been taken. It happened, however, that in the case of Rice such evidence had been taken and was then before the court.

The referee's report stated as follows : " On June 1st, 1875, the said Raymond made to A. G. Rice his bond conditioned for the payment of $9337 on June 1st, 1876, and to secure the same executed and delivered to the said A. G. Rice his mortgage of the premises known as Nos. 252, 254, 256, and 258 King street, this mortgage being a third one on the stores Nos. 252 and 254, the first and second having been executed to the executors of Poincignon. In addition to the usual covenants this mortgage contained the following, viz.: ' And it is agreed by and between the said parties that in case default shall be made in the payment of the principal or interest of the bond hereby secured, or in the payment of the principal and interest of the bonds or either of them, executed by the said H. H. Raymond to W. G. DeSaussure, Julius Trouche, Florence T. Downey, and Lawrence A. Duval, executors of Poincignon, on August 14th, 1873, and secured by a prior mortgage of a part of the premises hereinbefore described, etc., . . or in case default shall happen to be made in the performance of any of the covenants or conditions herein contained, etc., etc., that the said A. G. Rice, his heirs, executors, administra-

tors, or assigns, shall and may peacefully enter into, have, hold
and occupy, possess and enjoy the premises above mentioned,
and collect all rents, issues, and profits of the same, and every
part thereof, etc. etc.' There was due on this bond March
20th, 1877, the sum of $11,022.76. Under the power con-
tained in the said mortgage the said A. G. Rice entered and
took possession of the said premises on January 14, 1876, the
said H. H. Raymond having failed to perform the covenants
contained in the said mortgage, etc."

With these facts before it the court decided as follows:
" There are therefore no such findings of fact and conclusions
of law on that point as to bring the case before us for a final
decree. . . We can therefore do no more than lay down the
principles which should govern such findings, so far as we are
enabled to state them from the facts before us.

"*As it regards the claim under the mortgage of H. H. Ray-
mond to A. G. Rice,* the finding of fact of the referee appears
sufficiently full to present the question, whether such mortgage,
in virtue of the proceedings had under it, operated as an alien-
ation of the land descended under the statute of 3 and 4 W.
and M. These findings do not appear to have been excepted
to, and must stand as final. It appears that the mortgage con-
tained a clause that in certain contingencies, among others that
of default of payment of principal or interest on the bond
which such mortgage was given to secure, the mortgagee, Rice,
shall and may peaceably enter into, have, hold, use, occupy,
possess, and enjoy the said premises above mentioned, and
collect all rents, issues, and profits of the same, and every part
thereof. Directions were then given as to the application of
the money arising therefrom, among other purposes to that of
the payment of principal and interest due on the said bond
and mortgage. It appears by the findings of the referee, that
under this power the mortgagee, A. G. Rice, *entered and took
possession of the mortgaged premises on January* 14, 1876,
prior to the commencement of this suit, as upon condition
broken. It is clear that the mortgagor was out of possession
as it regarded such mortgaged premises at the time of the
commencement of the present suit. Under such circumstances

the decision in the case of *Simons* v. *Bryce* is inapplicable, as it regards the lands so mortgaged and out of the possession of the mortgagor. The statute of 1791 only operates to prevent the mortgage from having its due effect at common law while the mortgagor is in possession. The moment that possession passes out of him, in the sense of the statute, title passes through the mortgage under the operation of the statute, and the mortgagor occupies the same position he would have occupied had the statute never been passed. Under such circumstances this mortgage would be competent to work an alienation under the statute of 3 and 4 W. and M. It is claimed here that in order to establish possession out of the mortgagor, it is necessary to show that he has conveyed the mortgaged premises by an absolute deed to a third person, who is in possession under such deed. We have been referred to several cases in this state as supporting such proposition. None of the cases cited either directly or indirectly sanction such a conclusion. In *Laffan* v. *Kennedy*, 15 *Rich.* 246, it was held that the mortgagor was not to be considered out of possession so long as the premises were in the possession of a tenant holding under him. This case rests on the familiar principle that the possession of the tenant is the possession of the landlord. *Where the mortgage contains authority for the mortgagee to enter upon condition broken, and take and hold possession with the rents and profits, and after condition broken is let into such possession by the mortgagor, the latter is clearly out of possession through his own act and deed in the sense of the statute. As to such alienated premises the plaintiff cannot follow the land, etc.*"

It seems to us that it was the intention of the Supreme Court to make an exception of the case of Rice, and to decide it finally. It is stated that the findings of facts " are sufficiently full to present the question" which was considered and decided. It is true that Judge Willard was in error when, in delivering the judgment of the court, he stated "that the findings had not been excepted to ;" but, after hearing the testimony upon which the report was based, and full argument thereon, the judgment of the court surely cannot be impaired

by the fact that the then chief justice who prepared the judgment had in such voluminous brief overlooked the fact that the findings had been excepted to by the plaintiff, but not by the co-defendants of Rice!

The facts considered by the Supreme Court have not been shown to be incorrect, but it is simply claimed that the alienation which was declared was "not a *bona-fide* alienation, and that the mortgagor was not out of possession so as to defeat the claims of creditors of the ancestor." As it seems to be admitted that the court passed upon the question of alienation, the circumstances of the case show, and the judgment expressly declares, that the alienation spoken of could be no other than that contemplated by the statute. The judgment that the mortgage, in connection with what was done under it, worked an alienation under the statute of 3 and 4 W. and M., was in effect a judgment, also, *that such alienation* was *bona fide*. There could be no alienation under that statute except a *bona-fide* alienation, which placed the land beyond the reach of the creditors of the ancestor.

It must be kept in mind that the mortgage of Rice contained an unusual covenant allowing the mortgagee, upon default, *to take possession*. It was very nearly an absolute conveyance at first. That covenant was made when the mortgage was executed in 1875, and not on January, 1876, when it was known that Warren was about to sue and he took possession. In 1875, when the mortgage was executed, Rice had the right to exact his own terms as the condition upon which he would loan his money. The covenant in the mortgage expressed these terms. If he had then taken an absolute conveyance, would it not have been a *bona-fide* alienation? The fact that at that time he had notice of the claim of *Thomas* was not enough to make the alienation *mala fide*.

The question as to the *bona fides* under the statute is not identical with that of the equitable plea of purchaser for value *without notice*.

This court, following the English cases, has held in *Smith* v. *Grant*, 15 *S. C.* 136, that *mere notice* of debts against the ancestor is not of itself sufficient to make an alienation by an

heir or devisee *mala fide* under the statute.   In that case the
alienation was made through a bankrupt court by a devisee,
who was at the time also executor of the ancestor, and had
been actually sued as such, but not as heir.   The alienation in
*Richardson* v. *Chappell*, was also made by those who were the
executors of the ancestor, and had notice of the debt.   There
is no analogy between this case and *Lowry* v. *Pinson*, 2 *Bail.*
324, cited by the referee.   In that case Pinson purchased and
paid for the land of his brother, in order to enable him to run
away, and thereby evade an action which was about to be
brought against him for a breach of promise to marry.   In this
case the facts show no such combination on the part of Rice
and Raymond to defraud the creditors.   What Rice did in
January, 1876, was not done in combination with Raymond,
but was his own act in enforcing rights *acquired previously*.
Rice did no more than an honest creditor had the right to do
—that is to say, acting upon rights previously secured, to take
possession, and thus save himself from impending ruin.   We
agree with the Circuit judge, that the claim of A. G. Rice
was conclusively determined by the judgment of this court.

The mortgagor, H. H. Raymond, being out of possession of
the lands covered by Rice's mortgage, the mortgages covering
the same lands to the executors of Poincignon operate also as
an alienation.

The only remaining question is that which was "opened"
by the decree, and referred back by this court, whether the
mortgagor, H. H. Raymond, was, as to any of the other mort-
gages, *out of* possession before action brought against him as
heir, January 17, 1876.   The referee reports that, as matter of
fact, he was *not* out of possession as to any of the mortgagees,
and the Circuit judge concurs with him as to all of these except
Rice, whose case has been disposed of.   In the case of such
concurrence this court, as a rule, will not disturb the finding,
so far as it is based upon a question of fact.

It is contended, however, that H. H. Raymond was out of
possession as mortgagor by operation of law, as to the parcels of
land, of which he executed two mortgages, viz., lot No. 262
King street, first mortgaged to Ellen Barker, trustee, June 28,

1870, and afterwards July 1, 1873, to Anna Dora Fleming; and lots No. 342 and 344 King street, first mortgaged to executors of J. C. Otjen, January 15, 1872, and afterwards July 27, 1875, to W. J. Gayer.

This is certainly a question of novel impression. If the view suggested should prevail, the mortgagor might be held to be *legally* out of possession, whilst he *was in fact* in possession. The act of 1698, " To prevent deceits by double mortgages" (2 Stat. 137), provided : " If it so happens there be more than one mortgage at the same time by any person of the same lands and tenements, the second mortgagees which have not registered or recorded their mortgages . . . shall have power to redeem, etc. And any person or persons which shall mortgage the same lands . . . a second time, a former mortgage being in force and not discharged, shall have no power or liberty of redemption in equity or otherwise." The act of 4 and 5 W. and M. (2 Stat. 534, 1712) provided : " And if the said mortgagor shall mortgage again the same land, and shall not discover to the said second or other mortgagee in writing under his or their hand, that then and in that case the said mortgagor shall *have no relief or equity of redemption* against the said second or other mortgagee . . . and shall hold and enjoy the premises freed from the equity of redemption . . . as fully as if the same had been an absolute purchase."

The act of 1791 (5 Stat. 169) changed entirely the character of a mortgage, making it merely a security for a debt instead of a conveyance on condition, declaring that the legal title should remain in the mortgagor, and then provided that " when the same lands are mortgaged at *divers times*, the debts meant to be secured by such mortgages shall be paid in the order the same are recorded, etc."

The law stood in this way until our General Statutes were adopted in 1872. It does not appear that there ever was an express repeal of the provision of the act of 1698, which imposed a forfeiture of the right to claim the equity of redemption for giving a second mortgage, but the subsequent acts giving the mortgagor the legal title, declaring a mortgage a se-

curity for a debt, and in case of double mortgages directing that
the debts shall be paid in the order in which the mortgages
are recorded, were manifestly inconsistent with that provision,
which was thereby superseded and rendered obsolete, if not
repealed by implication.   This view is confirmed by the fact,
that no trace whatever of the doctrine can be found in the
reports *since* 1791, now nearly a century, although in that time
many cases were before the courts in which two mortgages on
the same property had been executed.   In 1806, *Duncan* v.
*Fisher*, 2 *DeS.* 369 ; in 1852, *Mathews* v. *Preston*, 6 *Rich.
Eq.* 307 ; in 1854, *Boyce* v. *Boyce, Id.* 304 ; *Reeder & Davis*
v. *Dargan*, 15 *S. C.* 175 ; *Gibbes* v. *Greenville and Columbia
R. R.*, 13 *S. C.* 228, and in 1878, *Simons* v. *Bryce*, 10 *S. C.*
363 ; and in this last case both mortgages were executed after
the General Statutes were adopted in 1872.

It said, however, that the General Statutes (1872) repealed
all these old statutes, and re-enacted only that part of the act
of 1798, which declared " every person or persons who shall
mortgage the same lands and tenements a second time, the
former mortgage being in force and not discharged, shall have
no power or liberty of redemption in equity or otherwise "
(Gen. Stat. 424); and it is ingeniously argued, that as the second
mortgages in this case were executed *after the adoption of the
General Statutes*, this provision therein revived cannot now be
said to be antiquated or to have gone into the General Statutes
by accident or mistake, and is applicable to them.   It is true
the provision was re-enacted, and on the statute-book from
1872 to 1878, and must be considered ; but the General
Statutes at the same time re-enacted the act of 1791, which
has long been regarded as the settled law of the state, and with
its whole intent and scope the provision aforesaid was incon-
sistent and repugnant, and therefore inoperative, and was ex-
pressly repealed in 1878 (16 Stat. 335).

It was further contended that Raymond was out of posses-
sion in fact as to the lands mortgaged to W. J. Gayer, because
Raymond had assigned the rents to Gayer.   It does not appear
that this mortgage had any covenant as in that of Rice, author-
izing the *mortgagee to take possession*.   The effect of the

assignment of the rent was considered by the Supreme Court, which held that "in order to determine whether that transac-tion was of such a nature as to amount to a surrender of pos-session by the mortgagor to the mortgagee there should have been a finding of fact whether such was *the act and intent of the parties*." And accordingly the matter being thus "opened," the referee reconsidered it and reported as follows : "The whole testimony shows that Mr. Gayer did just what under the assignment he had a right to do, to collect and secure the rents from the King street property, and it shows nothing more. He employed an agent, and the payment of the rent to him, if known to Raymond, was only what was contemplated by the assignment. There is no allegation or proof that Gayer or King, his agent, was acting adversely to Raymond, or that Raymond ever contemplated or agreed to anything more than the collection of the rents and the retaining of the same by Gayer. In my opinion, there is no testimony, even admitting that of Mr. Gayer, to prove that the mortgagor, Raymond, surrendered possession of the mortgaged premises to the mort-gagee Gayer, or that it was the act and intent of Raymond so to do, and I so find, etc." In this finding, the Circuit judge concurred, and we cannot say that it was error.

It was also contended that Raymond was *out of possession* as to the lands mortgaged to Douglas Nisbit, guardian. Upon this mortgage an action of foreclosure had been commenced in September, 1875, against H. H. Raymond, and William M. Thomas made a party. He urged as a defence against fore-closure the Carroll decree of 1868, at Greenville, and that an execution had been lodged in Charleston. The issues were referred to W. P. DeSaussure, Esq., who, among other things, reported "that as between the parties to the original suit, it (the Carroll decree) may constitute a general lien upon the property formerly of Mary Raymond, but which cannot be enforced to the prejudice of subsequent lien creditors or pur-chasers without notice." Judge Reed confirmed the report, and adjudged that "the exceptions filed by the defendant William M. Thomas, and overruled by the referee, be over-ruled by this court, and it is adjudged, ordered, and decreed

that the defendant, William M. Thomas, having failed to produce any evidence of an enrolled decree pursuant to the act of 1840, has failed to show a *judgment* which could constitute a lien upon the mortgaged property as against the plaintiff a third party, and that his claim to hold such lien be subordinated and postponed to the mortgaged lien held by the plaintiff." There was no appeal from this decree, but we do not consider that it adjudged the question now before the court. The decree was rendered December 4, 1875, before Warren had brought his action against H. H. Raymond, *as heir in possession.* Considering the property as belonging to H. H. Raymond, which they had a right to assume until action brought, it was simply a decision as to *priority of liens as against him,* and we have hereinbefore announced the same proposition, that all the judgments against H. H. Raymond, including that of Thomas without lien, must yield priority to the mortgages, but that is very different from the question now made by the *creditors* of *Mary Raymond* against H. H. Raymond as heir in possession of her property. The point now in issue was not decided. *Hart* v. *Bates,* ante, p. 35

The sale was ordered January 6th, *before,* but was not actually made until *after* Warren had brought his action and made Nisbit a party. " There can be no doubt that when property descended is mortgaged by the heir, and such mortgage is foreclosed and the *property actually* sold under a decree of foreclosure, it is an alienation." But the title of the mortgagor is not divested *until the sale is actually made.* The referee finds that " no sale was made until June 6, 1876, with full notice of this action then pending, and to which Nisbit was in fact a party. The property was bid in at the sale by Nisbit, the mortgagee. I find as to this mortgage, the mortgagor was *not out of possession* prior to the commencement of this action," and the Circuit judge concurred in this finding.

But it is urged, that while the sale made under the decree of foreclosure June 6, 1876, may not have been an effective alienation as to Warren and Thomas, it was as to B. J. Whaley, trustee, who did not appear in the case as creditor of the ancestor until after the sale. It is true, that the question as to

the effect of alienation depends upon the time when the creditor brings his action against the heir. The words of the statute are "before action brought." In order to determine whether a transaction was an effectual alienation as to him it is necessary to inquire *when* B. J. Whaley brought his action against H. H. Raymond. Warren and Thomas were parties to the original bill, but Whaley was not. The first appearance of his claim in the case was in the report of the referee, December 7, 1877. The referee in his second report, February 12, 1880, says: "Some questions have been made as to the time when this bond was proved before the referee. I do not see that it is material. Mr. Whaley was examined on May 4, 1877, as a witness, but not to prove the bond. No exception up to this time has been taken as to the time when the bond was proved in the case, and I report as a finding of fact, that it was properly and duly proved in the cause before me." The first report held all the mortgages to be alienations, and there was then no occasion to except.

The view of the referee as to the immateriality of the time the bond was proved most probably was, that the suit of Warren was in effect also that of Whaley. The complaint did state that it was "in behalf of himself and all other creditors of Mary Raymond, deceased, who should come in and contribute to the expenses of the action." But this action as originally brought cannot be considered as in the nature of a creditor's bill to marshall the assets of Mary Raymond, upon whose estate there was at that time no administration. It could be nothing more than an action against the heir H. H. Raymond then living, *to make him liable for the debt of his ancestor.* Each creditor of Mary Raymond had the same right, but we cannot see that in such action the interest of creditors was in common in such sense as to bring them within the principle of the rule that allows one of a numerous class of creditors *jointly interested* to sue for himself and others. There was no common fund which belonged to all equally. As in the lifetime of Mary Raymond, each was entitled to have his debt paid according to the diligence he might exhibit in obtaining priority.

In this view Warren's action was his own, and not that of any other creditor, whom he did not expressly make a party. As was said by Chancellor Johnston, in the case of *Johnson* v. *S. W. R. R. Bank*, 3 *Strob. Eq.* 336 : " There is a difference among cases arising from their very nature which must govern the court in its rules of practice. There are cases where the very right under which the plaintiff claims implies that he is entitled to its enjoyment only in conjunction with other persons. There are cases where no such implication necessarily arises from the nature of the right, but yet it may be shown by the pleadings or proofs that other persons have in fact a *community of interest with the plaintiff*. There are other cases still in which the claim set up by the plaintiff *is in its nature exclusive of other persons*. Of the latter class there are numberless instances, such as mortgagees or others holding a lien or suing to establish some peculiar interest, or *seeking a priority of right*. In *such cases it would be error in the plaintiff to conjoin other creditors with him in the bill, or to sue in behalf of himself and other creditors.* . . . He who comes to assert a peculiar or distinct claim cannot sue in conjunction with other persons. . . . At law, certainly every creditor *must* sue for himself, and cannot join the case of any other creditor." The action of the plaintiff, Warren, was under the statute against the heir then living, and could not be united with another creditor entitled to a similar action.

This was the state of the pleadings certainly up to the death of H. H. Raymond, and the grant of administration upon the estate of Mary Raymond, February 20, 1877. After this change in the condition of things it seems that the complaint was amended and other parties brought in so as to make it substantially an action to marshal assets, call in creditors, and enjoin them from suing, etc. The claim of B. J. Whaley, trustee, was presented under the call for creditors. It does not appear at what precise time he proved his claim, and thereby *brought this action*, but it must have been after June, 1876, when the Nisbit sale in foreclosure was completed, and therefore operated as an alienation before action brought as to Whaley. The sale to Wilson of part of the premises thus sold

was after the purchase by Nisbit, and the agreement to litigate for the proceeds instead of the land, made in order to quiet the title of the purchaser, cannot alter the case.

The same principle must be applied to the proceeds of the premises mortgaged to Mrs. Maria S. Hopkins. Her mortgage contained a power to sell and convey, yet she instituted suit against H. H. Raymond to foreclose her mortgage, and as early as June, 1875, obtained a decree of foreclosure and sale. The order authorized H. H. Raymond to sell the premises, and he offered them for sale in December, 1875, but the purchaser failing to comply with the terms of sale, Mrs. Hopkins was authorized by order of court, January 14, 1876, to take the premises at the price bid for them, and under this order titles were executed to her on January 17, 1876, the very day on which Warren commenced his action. In the order directing titles to be made to Mrs. Hopkins this paragraph was inserted: "And it being reported to the court that John D. Warren, a creditor of Mary Raymond, through whom it was alleged that the defendant, H. H. Raymond, has derived said property, may seek to subject the premises ordered to be conveyed to the payment of her debts, and that he is not a party to these proceedings, it is adjudged that said conveyance be without prejudice *to his rights*, and that the premises so ordered to be sold shall *as to him* be subject to the same rule which would have been applicable thereto in the hands of H. H. Raymond, the mortgagor."

This order saved the rights of Warren to proceed as if no sale had been made, but we do not see how it can have that effect as to B. J. Whaley, trustee, who had not appeared in the case, who was not named as a creditor, and did not present his claim until long after. By a subsequent arrangement with Thomas his rights against the alienation were also secured. We cannot discover, however, that any such arrangement was ever made with B. J. Whaley, trustee, and, as in this action the arrangement with Warren could not enure to his benefit in the matter of time, the conveyance to Mrs. Hopkins was as to Whaley an alienation " before action brought."

We conclude, therefore, that the proceeds of all the property

of which Mary Raymond died seized and possessed, except that which was alienated to A. G. Rice, by H. H. Raymond, must be applied, if so much be necessary, in payment of her debts, as established herein, viz.: John D. Warren, B. J. Whaley, trustee, and William M. Thomas, according to the principles herein announced. That is to say, the proceeds of all the remaining parcels, except those covered by the mortgages of Nisbit and Hopkins, in payment of all the three creditors in proportion to the amount of their claims, and the proceeds of the last-mentioned lots mortgaged to Nisbit and Hopkins in payment of the claims of Warren and Thomas.

It was stated at the bar that these claims would exhaust the whole proceeds of sale subject to their payment. If so, the order in which the proceeds should be applied is not important. We recognize the rule to be as stated in the case of the *Savings Bank* v. *Creswell*, 100 *U. S.* 638, where Mr. Justice Miller says : " The court granted such relief as is authorized by the principle that where real estate is subjected to a lien in the hands of its *owner*, and he sells or mortgages separate parcels of that property subsequently to different persons and at different times, these parcels shall be subjected to payment of the lien in the inverse order of their alienation." See *Bank of Hamburg* v. *Howard and Garmany*, 1 *Strob. Eq.* 178.

If Mary Raymond, the owner of this property, had executed these mortgages, that would certainly have been the rule, for the reason that each successive mortgagee would have had the right to throw subsequent mortgagees upon the property of the mortgagor not encumbered. The mortgagor would certainly have been liable in that order, and each mortgagee " sits in the seat of his mortgagor." The matter is not so clear however where the mortgagor was not *the owner of the property except sub modo*, subject to the debts of the ancestor. As against these all mere encumbrances by the heir were simply void. Nothing could affect them short of alienation under the statute. But as the heir had a possible interest in the property which might remain after satisfying the debts of the ancestor, we think it safer that the proceeds of sale of the different parcels of the property should be applied in the inverse order,

the last first, of the dates of the mortgages covering them respectively.

The judgment of this court is, that the judgment of the Circuit Court, subject to the modifications herein directed, be affirmed.